James JAMESON *v.* STATE of Arkansas

CR 97-1043                                    970 S.W.2d 785

Supreme Court of Arkansas
Opinion delivered May 7, 1998

*Val P. Price*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant James Jameson brings this appeal from his convictions of kidnapping, a class Y felony, and rape of a five-year-old victim, E.C. He raises three points for reversal, but we hold none has merit.

■ Because this court considers review of sufficiency of the evidence arguments prior to a review of trial errors, we first address Jameson's argument that the trial court erred in denying his motion for directed verdict on the rape charge. *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997). The test on appeal, of course, is whether there is substantial evidence to support the ver-

dict. *Lukach v. State*, 310 Ark. 119, 835 S.W.2d 852 (1992). On review, it is only necessary for us to ascertain that evidence which is most favorable to the appellee. *Id.*

On November 2, 1996, at about 8:00 p.m., Becky Moore took her two minor daughters to Hastings Video Store in Jonesboro to rent a movie. Her five-year-old daughter, E.C., went to the children's section, but minutes later, when Becky tried to locate her, E.C. could not be found. Subsequently, Becky contacted family members. Becky, along with the help of her family and law officers, who had been called, searched for E.C. to no avail. About 9:00 p.m., E.C.'s grandmother saw E.C. outside the store coming around the store's building; the grandmother got E.C. and took her inside the store. E.C. was missing her baseball cap and the hair bow she had been wearing. When asked where she had been, E.C. responded, "A guy picked me up and took me to his house." Jane Sanders, who had been sitting in her car parked in the store's parking lot, reported to officers that she had seen a red truck pull up next to her car and open his door to retrieve what appeared to be a tiny child. Sanders described the man as being in a hurry when he placed the child on the sidewalk in front of the truck's grill; he then scurried back into his truck and left in a hurry. Sanders described the night as cold, and voiced disbelief in seeing a man "dropping off" a tiny child on the sidewalk and leaving the child alone. Sanders said the man was tall, skinny, and had somewhat red or blond hair.

E.C. then told police officers she could lead them to the house where she was taken. During the ride to the house, E.C. told her mother that the kidnapper had knocked her hat off while putting her in his truck and had leaned over and kissed her. E.C. related further that the man, once inside his house, took his and E.C.'s clothes off, and he handcuffed her to a stove. E.C. was able to identify Jameson's house and his truck as the one in which her kidnapper had placed her. Officers noticed her missing hair bow lying in Jameson's locked truck.

The officers went to the house, knocked on the door, and Jameson opened it. Jameson was then advised of his *Miranda* rights, and asked what he had been doing with E.C. Speechless

and stunned for a while, Jameson responded affirmatively to Investigator Roger Morphis's question, "Did you just bring her home and then take her back?" Jameson was arrested, taken to the police department, and later charged with kidnapping and rape.[1]

About ten days after E.C.'s kidnapping, she revealed to her mother further details of what had happened on November 2nd. E.C. and her mother were at home when E.C. said, without prompting or forewarning, "I've got something to tell you, and you are going to get mad." E.C. then related that, after Jameson had handcuffed her to the stove and took off her clothes, he licked her genital region, and told her "if she wouldn't stick his bottom in her mouth, he wouldn't take her back." She further said, "He forced his bottom in her mouth, and some white stuff fell on her stomach and toe." E.C. told her mother that Jameson "washed it off."

After these more detailed revelations given by E.C. of what occurred on November 2, Becky Moore called Dr. David Blaske. Dr. Blaske is a clinical psychologist with the Child Youth Development Center, who counseled E.C. after E.C.'s abduction. Dr. Blaske said that, in his initial visits, he merely tried to gain E.C.'s trust, and they did not discuss the details of what happened during the kidnapping. She merely related that "the man had touched her on her shoulder." Dr. Blaske described E.C. as a reserved, non-verbal child, who was repressing the incident. About two days after E.C. disclosed the foregoing sexual details to her mother, Dr. Blaske said E.C. related to him that Jameson had "licked" her and forced his "bottom" into her mouth. In sum, E.C. told Dr. Blaske the same version of the kidnapping and rape incident that she had previously told her mother.

Other evidence given supporting E.C.'s and the other witnesses' versions depicting kidnapping and rape, included Nurse Pam Widdick's testimony that the medical exam performed on E.C. during the night in question showed redness in her vaginal area and abrasions on her right wrist. Furthermore, Investigator Morphis testified that, upon searching Jameson's house, officers

---

[1] He also was charged with other crimes not relevant here.

found a shoebox in one of the bedrooms, which contained hand-cuffs, crayons, markers, condoms, and a camera.

■ Having reviewed the evidence above, we conclude it unquestionably supports the jury's verdict that Jameson raped E.C. A person commits rape if he engages in sexual intercourse or deviate sexual activity with another person, who is less than fourteen years of age. Ark. Code Ann. § 5-14-103(a)(3) (Repl. 1997). Deviate sexual activity means any act of sexual gratification involving the penetration, however slight, of the anus or mouth of one person by the penis of another person, or the penetration, however slight, of the vagina or anus of one person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-14-101(1)(A) and (B) (Repl. 1997). This court has held that penetration can be shown by circumstantial evidence, and if that evidence gives rise to more than a mere suspicion, and the inference that might reasonably have been deduced from it would leave little room for doubt, that is sufficient. *Jackson v. State*, 290 Ark. 375, 720 S.W.2d 282 (1986). Our court has also found substantial evidence of rape by deviate sexual activity even though there was only a hearsay statement of the child victim. *Peebles v. State*, 305 Ark. 338, 808 S.W.2d 331 (1991).

■ Here, Jameson concedes, as he must, in view of the evidence, that he kidnapped, handcuffed, and stripped E.C. as described by the State's proof; however, he denies any proof was shown of penetration, which is needed to show rape. Jameson's argument is meritless and belies E.C.'s description to her mother and Dr. Blaske regarding what took place in Jameson's house, and ignores the other physical evidence related by Nurse Widdick and Investigator Morphis. This evidence was more than ample to show all the required elements of rape. Thus, we affirm the trial court's ruling denying Jameson's directed verdict motion on this point.

We next consider Jameson's argument that the trial court committed error in ruling that Becky Moore and Dr. Blaske could testify to what E.C. had told them some ten days to two weeks after the November 2, 1996, crimes occurred. In making this

argument, Jameson concedes that Becky Moore and the other witnesses present at the crime scene on November 2nd could testify concerning what E.C. told them that day, but insists that hearsay statements of E.C. after November 2 are inadmissible under A.R.E. Rule 804(b)(7). Rule 804(b)(7) provides that the hearsay statement of a child who is under ten years of age and unavailable as a witness, is presumed unreliable and inadmissible unless the trial court, after conducting a hearing outside the presence of the jury, finds the statement possesses guaranties of trustworthiness that the truthfulness of the child's statement is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility. Rule 804(b)(7)(A) lists twelve factors that a trial court may employ in deciding whether a child's hearsay statement(s) is sufficiently trustworthy.[2] Jameson asserts that the trial court here abused its discretion in utilizing those factors when ruling Becky Moore and Dr. Blaske could testify to what E.C. told them ten-to-twelve days after her abduction.

In deciding whether the statements E.C. related to her mother and Dr. Blaske possessed sufficient guaranties of trustworthiness, the trial court painstakingly considered most of the factors set out in Rule 804(b)(7)(A). In doing so, it found that, even though E.C. had ten days during which she could fabricate a story, the court could discern no reason why she would. While Jameson argued that E.C. had made no specific sexual allegations

---

[2] The Rule provides the trial court may employ any factor it deems appropriate, including, but not limited to, the following list:

1. The spontaneity of the statement.
2. The lack of time to fabricate.
3. The consistency and repetition of the statement and whether the child has recanted the statement.
4. The mental state of the child.
5. The competency of the child to testify.
6. The child's use of terminology unexpected of a child of similar age.
7. The lack of motive by the child to fabricate the statement.
8. The lack of bias of the child.
9. Whether it is an embarrassing event the child would not normally relate.
10. The credibility of the person testifying to the statement.
11. Suggestiveness created by leading questions.
12. Whether an adult with custody or control of the child may bear a grudge against the accused offender, and may attempt to coach the child into making false charges.

about penetration or ejaculation in her story on November 2, E.C. commenced revealing the details of Jameson's sexual abuse of her by telling of his kissing, handcuffing, and stripping her while at his house. And though E.C. did not immediately tell anyone of how Jameson "licked" her and put his "bottom in her mouth," the evidence showed that she was clearly afraid to give those details because her mother would "get mad." The trial court determined that the manner in which she told her mother about Jameson's acts was spontaneous. In other words, E.C. finally felt compelled to relate the details even though it would invoke her mother's anger. The trial court also noted E.C. had never recanted any portion of her story, and although E.C. at one stage related only that Jameson touched her on the shoulder, the court indicated that any such inconsistency (if it was an inconsistency) would be before the jury and the jury could determine any credibility issue. *See Johnson v. State,* 298 Ark. 617, 770 S.W.2d 128 (1989).

In addition, E.C. was described by witnesses and the trial court as a quiet, reserved, nonverbal child, who had no motive to fabricate or to harbor a bias toward Jameson. While the trial court made no real determination of E.C.'s competency, the evidence reflects she had considerable awareness and knowledge of what happened to her on November 2, and who did it. At the tender age of five, E.C. was abducted by an unknown man, placed in a truck, kissed, taken to a strange house, handcuffed, stripped, returned near the store from which she was taken; nonetheless, she still had the composure and ability to tell her mother and officers of these events and lead officers to the house where the sexual abuse she described took place. Before taking officers to Jameson's house, she had already been shown a possible suspect whom she rejected as being the person who kidnapped her. E.C.'s actions in these matters showed an unusual ability for a child of her young age.

The trial court further considered E.C.'s language and terminology when describing Jameson's treatment of her, and it concluded that such terms would be expected of a five-year-old. Also bearing on E.C.'s credibility, the trial court found that what E.C. described as having happened to her encompassed embarrassing

events a child normally would not want to relate; and as pertains to her mother's credibility, the statements included events Moore did not want to hear or believe had happened. Finally, the trial court stated that, after listening to Dr. Blaske's counseling tapes with E.C., it found no suggestive or leading questions, and reiterated the fact that it was E.C. who initiated the original disclosure of Jameson's abuse, not the mother, Dr. Blaske, or other witnesses.

██ ██ In deciding this second point for reversal, we note the settled law that a trial court's rulings on matters pertaining to the admission of evidence is within the judge's discretion and his rulings will not be set aside absent an abuse of discretion. *Roleson v. State*, 277 Ark. 148, 640 S.W.2d 113 (1982). Here, the trial judge carefully considered, weighed, and detailed the factors under Rule 804(b)(7)(A) before ruling E.C.'s hearsay statements should be admitted into evidence, and we cannot say he abused his discretion in doing so.

Jameson's final contention challenges the trial court's refusal of his motion to restrict the State's charge to class B kidnapping, a felony which bears a sentence of not less than five nor more than twenty years' imprisonment. *See* Ark. Code Ann. § 5-4-401 (Repl. 1997). Instead, the trial court found sufficient evidence for the jury to find Jameson guilty of class Y kidnapping which may include a sentence of not less than ten years nor more than forty years, or life imprisonment. *Id.* Jameson was sentenced to life.

Under Ark. Code Ann. § 5-11-102 (Repl. 1997), the crime of kidnapping is designated a class Y felony, except that, if the defendant shows by a preponderance of the evidence that he or an accomplice voluntarily released the person restrained and alive in a safe place prior to trial, it is a class B felony. Here, Jameson argues that, because he returned E.C. alive and in a safe place near where he had originally abducted her, the kidnapping was a class B felony as a matter of law and the jury should not have been permitted to determine which of the two felonies, class Y or B, should have applied. The trial court disagreed, following instead the rationale of AMCI2d 1101-Exp that there was sufficient evidence presented to afford the jury a rational basis for finding that the safe release of the victim had been proved. Having made that finding, the trial court ruled a question of fact existed for the jury to decide. The trial court then read AMCI2d 1101-Exp to the jury,

instructing it to determine whether Jameson had by a preponderance of the evidence shown he had voluntarily released E.C. in a safe place. In its verdict form AMCI2d 1101-VF, the jury specifically addressed that factual issue and found Jameson had not met his burden of proof, and thus, at the sentencing stage, imposed the class Y sentence of life imprisonment. We uphold that verdict.

Jameson relies primarily on the court of appeals' case of *Griffin v. State*, 2 Ark. App. 145, 617 S.W.2d 21 (1981), where the kidnapped victim was an adult who had been safely released by Griffin approximately one block from her house. The jury remained deadlocked on the rape charge against Griffin, but found him guilty on the greater kidnapping charge.[3] The court of appeals reversed that verdict, holding the proof showed only the victim's safe release and no evidence to the contrary. That is not the situation now before us.

As already thoroughly discussed, the evidence reveals that Jameson took a five-year-old child from the inside of a business store to his house, where he sexually abused the child before returning her to a sidewalk outside, but around the corner, from the store's entrance. It was dark and cold when he sped off in his truck, leaving the child to find her mother. The trial court found that, considering these events and the child's young age, a question of fact existed as to whether it was safe for Jameson to have released E.C. in the place and manner he did. In these described circumstances, we agree with the trial court that a fact question existed for the jury to decide which of the kidnapping felonies applied. *See Clark v. State*, 292 Ark. 69, 727 S.W.2d 853 (1987); *Whitt v. State*, 281 Ark. 466, 664 S.W.2d 876 (1984).

In accordance with Ark. Sup. Ct. R. 4-3(h), the record has been reviewed for all other rulings adverse to Jameson, and we find none which constitute prejudicial error.

For the reasons above, we affirm Jameson's convictions of rape and kidnapping.

---

[3] When *Griffin* was decided, kidnapping was designated a class A felony. Then, if the defendant, by a preponderance of the evidence, showed he had released the victim safely, the crime was a class C felony.