Phillip CHENOWITH *v.* STATE of Arkansas

CR 95-124                                    905 S.W.2d 838

Supreme Court of Arkansas
Opinion delivered September 18, 1995

*Laws & Murdoch, P.A.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Four women accused Phillip Chenowith of various offenses against them including rape, kidnapping, aggravated assault, and theft. An eight-count felony information was brought against Mr. Chenowith. A jury found him guilty of six counts. kidnapping and raping one victim (Victim 1), kidnapping and raping a second victim (Victim 2), as well as aggravated robbery of and theft of property from Victim 2. The Court pronounced sentences of 40 years imprisonment for kidnapping Victim 1, 60 years for kidnapping Victim 2, life imprisonment for the rape of Victim 1, life imprisonment for the rape of Victim 2, 40 years for aggravated robbery of Victim 2, and a fine of $1000 for theft from Victim 2.

In his statement of the case, Mr. Chenowith purports to appeal from all these convictions. The Judgment and Commitment Order entered by the Circuit Court, however, shows only convictions and sentences of 40 years and life imprisonment with respect to the kidnapping and rape of Victim 1 which occurred on March 15, 1993, and the sentence of 60 years imprisonment for the kidnapping of Victim 2 which occurred on March 30, 1993. We thus treat the appeal as being from those convictions and sentences only.

Mr. Chenowith argues his motion for directed verdict should have been granted because the evidence showed Victim 1 and Victim 2 were prostitutes who willingly accompanied Mr. Chenowith and willingly engaged in sexual acts with him and his co-defendant Mr. Harder. Mr. Chenowith has not abstracted the terms of his motion for directed verdict, nor has he cited any authority or made any convincing argument on this point. We would not address this point of appeal but for our Rule 4-3(h) which requires that we examine the record of trial in life imprisonment cases and review all errors prejudicial to the appellant. The record has been reviewed in accordance with the rule, and perhaps in an overabundance of caution, we have considered the sufficiency of the evidence. We hold the evidence was sufficient to support the convictions.

In another point of appeal, Mr. Chenowith complains that Victim 1's in-court identification of him should have been sup-

pressed as it was tainted by suggestive opportunities the State created for her to identify him prior to the trial. We hold the Court did not err in determining that the in-court identification was sufficiently reliable to be admitted.

### 1. Sufficiency of the evidence

The definition of rape found in Ark. Code. Ann. § 5-14-103(a)(1) (Repl. 1993) includes the following: "(a) A person commits rape if he engages in sexual intercourse or deviate sexual activity with another person: (1) By forcible compulsion. . . ." The definition of kidnapping in Ark. Code. Ann. § 5-11-102(a)(4) (Repl. 1993) includes the following: "(a) A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty with the purpose of: . . . (4) Inflicting physical injury upon him, or of engaging in sexual intercourse, deviate sexual activity, or sexual contact with him. . . ."

■■ A motion for a directed verdict is a challenge to the sufficiency of the evidence, and when such a challenge is made in a criminal case, we review the evidence in the light most favorable to the State, considering only that evidence which tends to support the verdict, and if there is any substantial evidence supporting the conviction, we affirm. *Wilson* v. *State*, 320 Ark. 707, 898 S.W.2d 469 (1995). It is also well established that the uncorroborated testimony of a rape victim is substantial evidence to support the verdict. *Caldwell* v. *State*, 319 Ark. 243, 891 S.W.2d 42 (1995).

Victim 1's testimony was that she was loitering for the purpose of prostitution on Asher Avenue in Little Rock at 4:30 a.m. on March 15, 1993. Two men, one of whom she later identified as Mr. Chenowith, approached her in a white truck. She got into the truck and sat between them. After they drove a short distance, Victim 1 had "bad vibes" and began to feel afraid and suspicious that she had been picked up by the police. When she asked if she was with the police, the driver responded that he was the police and that she was being picked up "for soliciting prostitution."

Victim 1 testified that the two men began to "read her rights" as they continued driving down Asher Avenue. They stopped at

an abandoned warehouse, where the driver began to taunt her and threaten to arrest her for stabbing an undercover detective. At that point, the two men got her out of the vehicle and frisked her, and then led her into the abandoned building. The man who had been the passenger then forced her to engage in sexual intercourse and fellatio with him. After those encounters, the driver came into the abandoned building, threatened to kill her, and forced her to engage in sexual intercourse and fellatio with him.

After the sexual encounters, the driver asked Victim 1 if she had any money, and when she responded that she did not, he threatened to kill her if she was lying. He then went through all of her pockets. The three reentered the truck, and Mr. Chenowith told Victim 1 to leave her shoes and socks off. He put them in the bed of the truck. They then drove to a remote part of Pulaski County. Victim 1 asked to be released, but the men refused. At one point, as they crossed train tracks, the two men discussed tying her to the tracks so they "could watch the train run over her." She testified that after making that comment they continued to discuss ways that they could kill her.

The driver stopped the truck on a patch of gravel somewhere in Pulaski County, and at that point, Victim 1 began to beg for her life. The men responded that they were just joking, and they then all sat on the tailgate of the truck while Victim 1 smoked a cigarette given to her by the passenger.

Victim 1 testified that the two men then forced her to run around while they tried to lasso her with a rope. After that, the driver showed her a gun and asked her if she could use it to kill him. He then asked her if she would engage in sexual intercourse with him again, and she testified she agreed because she feared the consequences if she refused.

Victim 1 testified the two men released her in front of a convenience store at Fouche Dam at approximately 7:30 or 8:00 a.m. She reported the incident two days after it happened. She later positively identified Mr. Chenowith from a photo lineup.

Victim 2 testified she was loitering for the purpose of prostitution in the early morning hours of March 30, 1993. She was standing by a public telephone at a convenience store when two men in a white "dually" pickup truck approached her. She said

they agreed on a price for fellatio, and then she got into the vehicle. After getting into the truck, Victim 2 began to direct them to her front yard, which she testified was her usual place of business for safety reasons. She stated that, once the driver refused to take her there, she wanted to get out of the truck.

The driver then took his companion and Victim 2 to an old sewing factory. At that point, the passenger pulled her out of the truck and one of the men took $29, cigarettes, condoms, and a lighter from her. Then one of the men threatened to kill her.

Soon afterward, the driver escorted Victim 2 to the side of the building, and while the passenger held a rope around her neck, the driver forced her to perform fellatio on him. Afterward, Victim 2 thought she could escape by offering the men some marijuana. With this promise, she successfully enticed them to take her to an automobile body shop, where she told them she kept the marijuana.

Once they arrived at the body shop, Victim 2 began to search for the marijuana while the men kneeled over her and threatened her with a box cutter. The owner of the body shop opened the garage door. Victim 2 broke free of Mr. Chenowith and his companion and screamed for help. The two men then got back into their truck and left.

The police were called, and Mr. Chenowith and the passenger of the truck were arrested later that night in the area of Asher Avenue. Victim 2 then went to the police station and identified Mr. Chenowith and the other man as her attackers. In addition, she identified the items that they had stolen, as well as the box cutter used to threaten her.

Police Sergeant David Ebinger testified he located Mr. Chenowith's truck after receiving the call about the incident involving Victim 2. He said the driver of the vehicle was identified as Phillip Chenowith, and the passenger was Mr. Harder. Sergeant Ebinger also testified that a rope and a large amount of cash were seized. Detective Deral Casteel testified that a box cutter and cigarette lighter were also seized.

■ Both women testified that when the sexual acts occurred they were not consensual but were forced. Both testified that they were taken to places they had not agreed to go. We

have been given no reason to hold that the fact that the relationships began as consensual ones obviates the possibility that they turned violent and forced. See *Thomas* v. *State*, 311 Ark. 609, 846 S.W.2d 168 (1993). The evidence of Mr. Chenowith's guilt of rape and kidnapping was substantial, thus the Trial Court did not err in denying the directed verdict motion.

## 2. Improper identification testimony

In July 1993, Victim 1 was in a holding cell in the Pulaski County Jail awaiting a revocation hearing when Mr. Chenowith was put in the cell next to hers. Victim 1 testified she recognized Mr. Chenowith on that occasion and had a conversation with him. On April 18, 1994, Mr. Chenowith was scheduled for an omnibus hearing in Pulaski County Circuit Court. Victim 1 was scheduled for a revocation hearing on that day as well. As a result, Victim 1 was in the courtroom during Mr. Chenowith's omnibus hearing.

Prior to trial. Mr. Chenowith moved to suppress Victim 1's in-court identification. He contended her additional opportunities to see him in the Pulaski County Jail and during his omnibus hearing created an impermissibly suggestive identification procedure resulting in an unreliable in-court identification. Although the Trial Court agreed that the two additional opportunities to see Mr. Chenowith were improperly provided by the State, he found the identification was reliable and denied the suppression motion.

A pre-trial identification violates the Due Process Clause when there are suggestive elements in the identification procedure that make it all but inevitable that the victim will identify one person as the criminal. *Monk* v. *State*, 320 Ark. 189, 895 S.W.2d 904 (1995).

In *Bishop* v. *State*, 310 Ark. 479, 839 S.W.2d 6 (1992), we discussed allegations of suggestive identifications. Even if the identification technique is impermissibly suggestive, it is for the Trial Court to determine if there are sufficient aspects of reliability surrounding the identification to permit its use as evidence, and then it is for the jury to decide the weight the identification testimony should be given. We do not reverse a ruling on the admissibility of an identification unless it is clearly erro-

neous, and we will not inject ourselves into the process of determining reliability unless there is a very substantial likelihood of misidentification. In the *Bishop* case, we noted the following factors to be examined to determine reliability: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the prior description; (4) the level of certainty; and (5) the time lapse between the crime and confrontation.

Although the additional opportunities that Victim 1 had to view Mr. Chenowith are arguably impermissibly suggestive, it cannot be said that the Trial Court was clearly erroneous when he ruled that the identification testimony was reliable. Victim 1 said her ordeal lasted approximately three to four hours and that she had the opportunity to view Mr. Chenowith under the light of the truck cab and in the daylight. She described Mr. Chenowith to the police as weighing 260 pounds and having thinning brown hair. He weighed 300 pounds but had thick brown hair. Lastly, only two weeks after the incident, and before the encounters at the Pulaski County Jail and at the omnibus hearing, Victim 1 positively identified Mr. Chenowith from a photo "showup." We cannot say there was error in admitting the in-court identification.

Affirmed.